**In re CHURCH AND INSTITUTIONAL FACILITIES DEVELOPMENT CORPORATION, Debtor.**

**Henry C. SEALS, Trustee, Plaintiff,**

v.

**The FIRST NATIONAL BANK OF AMARILLO, Defendant.**

**Bankruptcy No. 289–20384–11.**
**Adv. No. 290–2016.**

United States Bankruptcy Court,
N.D. Texas,
Amarillo Division.

Jan. 24, 1991.

Larry Sherman, Gibson, Ochsner & Adkins, Amarillo, Tex., for FNB.

Barbara E. Hargis, Harris, Finley, Creel & Bogle, Fort Worth, Tex., and Thomas Dixon, Jr., Underwood, Wilson, Berry, Stein & Johnson, Amarillo, Tex., for trustee.

Donald E. Patterson, Culton, Morgan, Britain & White, Amarillo, Tex., for the 5001 Bondholders Committee.

Henry Seals, Trustee-in-Bankruptcy, Fort Worth, Tex., trustee.

## MEMORANDUM OPINION ON PRIORITY OF LIENS

JOHN C. AKARD, Bankruptcy Judge.

In order to resolve the lien priority issues raised by this Adversary Proceeding, the court must determine whether a bond indenture trustee exceeded its authority. Finding that the trustee did not exceed its authority, the court holds that the liens held by the Plaintiff and Defendant have equal priority.

### FACTS [1]

Promoters formed a number of corporations to solicit, issue, market and service church bonds. Their misdeeds led to a state court receivership for Trust Company of America (TCOA), which was the trustee for various bond issues, and to the bankruptcy of Church & Institutional Facilities Development Corporation (C & I), a nonprofit corporation formed for the purpose of issuing bonds, the proceeds of which were used to finance churches. TCOA was trustee for the bonds issued by C & I. The First National Bank of Amarillo (FNB) is the successor to TCOA and Henry C. Seals is the Trustee-in-Bankruptcy for C & I.

Mr. Seals and FNB, both seeking to properly carry out their fiduciary responsibilities to the respective bondholders, dispute the priority of the liens each hold on the Richland Hills Church of Christ (RHCC) and the Corvallis Christian Center, Inc. (Corvallis). Both churches issued bonds for which TCOA served as trustee for the benefit of the bondholders. Deeds of trust on the churches' property secured the bonds. Corvallis became delinquent in payments to its sinking fund and realized that it would not be able to retire a portion of its bonds when they became due. RHCC anticipated that it would not be able to pay some of its bonds when they became due.

The promoters arranged for C & I financing which paid principal and interest on early-maturing bonds, paid interest on other bonds, and financed expenses in connection with the loan. The loans were secured by deeds of trust on the churches' real property. Each church, TCOA and C & I entered into "Modification and Ratification of Deeds of Trust" (Modification Agreements) which provided that: "Each of the Mortgages is hereby amended to provide that it shall be deemed to be of equal parity with the other Mortgages and that the Property shall secure, pro rata, the payment of the indebtedness described in each of the Mortgages...." [2]

Relying on the Modification Agreements, Mr. Seals asserted that the liens held by C & I are "co-equal" with those held by TCOA. FNB asserted that TCOA had no authority to grant a co-equal lien and, thus, TCOA's liens are entitled to priority over those of C & I. The parties determined that the properties involved are worth substantially less than the liens against them,

---

1. The court adopts the Statement of the Case contained in the Joint Pretrial Order. The court will state only its factual findings and a summary of the Statement of the Case as is necessary for this decision.

2. The liens held by TCOA and C & I were fully described and defined as mortgages in the Modification Agreements.

so subordination would have the practical effect of placing C & I in an unsecured position.

The trust indentures between the churches and TCOA are substantially identical. The pertinent provisions are:

### XI. Additional Bond Issues

Should Issuer at a later date decide to issue and sell additional bonds for the purpose of paying off any existing indebtedness against the property of Issuer, or for acquiring additional property or making permanent improvements to any of Issuer's property, or acquiring equipment, machinery or other fixed assets to be used by Issuer, or to exchange or replace any bonds of existing bond indebtedness created under the terms of this Trust Indenture, then Issuer may issue a new series of additional bonds hereunder which shall be secured pro rata and have equal priority in payment, provided: (1) additional mortgages shall be given by Issuer to TCOA on any new property acquired; (2) the total amount of bonds outstanding, after such additional bonds have been issued, shall never exceed seventy-five (75%) percent of the appraised value of the property securing the payment of such bonds as reflected in an appraisal obtained by TCOA at Issuer's expense from an independent appraiser, plus the cost of additional property and/or improvements being added; (3) Issuer is not in default of any of its covenants under this Trust Indenture; and (4) Issuer can support, to the satisfaction of TCOA, its ability to repay such additional bonds.

. . . . . .

### XXIV. Supplemental Indentures

(A) Issuer and TCOA, without the consent of the bondholders, from time to time may enter into one or more indentures supplemental hereto for any of the following purposes:

(1) to add to the covenants of Issuer, for the benefit of the bondholders, or to surrender any right or power herein conferred upon Issuer; or

(2) to cure any ambiguity or correct or supplement any inconsistent or defective provision contained herein or in any supplemental indenture, provided such action shall not adversely affect the interest of the bondholders.

(B) Issuer and TCOA, with the written consent of the registered holders of not less than eighty (80%) percent in principal amount of the outstanding bonds, from time to time may enter into one or more supplemental indentures for the purpose of adding provisions to or changing in any manner or eliminating any of the provisions of this Trust Indenture or for the purpose of modifying in any manner the rights of the bondholders hereunder; provided, however, that no such supplemental indentures shall, without the consent of the holder of each outstanding bond affected thereby:

(1) change the stated maturity date of the principal or any installment of interest on any bond; or

(2) reduce the principal amount or rate of interest on any bond; or

(3) impair the right to institute suit for the enforcement of payment on or with respect to the bonds; or

(4) reduce the percentage and principal amount of the bonds, the consent of whose holders is required for any such supplemental indenture; or

(5) modify any of the provisions of this section.

(C) It shall not be necessary for any consent of bondholders hereunder to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent approves the substance thereof.

TCOA guaranteed the bondholders prompt payment of principal and interest up to a total liability of $2 million on all such guarantees issued by TCOA.[3] Paragraph XXV of the trust indentures provides, in part, as follows:

---

**3.** Undoubtedly this liability of TCOA (along with the liability of a related insurance company which insured the payment of principal and interest on the bonds) motivated the promoters to prevent a default on the RHCC and Corvalis bonds by arranging financing through C & I.

7. That upon the payment by TCOA of any principal and interest to the bondholders, TCOA shall be subrogated to all claims, rights and causes of action which said bondholders would have against Issuer based upon the failure of Issuer to timely pay said payments, and additionally, TCOA shall have a lien against the property of Issuer to secure the repayment of all principal and interest paid, said lien to be secure prorata and to have equal priority with the bonds then outstanding as fully and completely as if additional bonds were issued to cover such payments.

8. That all principal and interest paid by the TCOA to the bondholders shall bear interest at the rate equal to 2% per annum in access (sic) of the highest rate of interest payable upon any of the bonds offered by Issuer pursuant to the provisions of this Trust Indenture, said interest to be calculated from and after the date or dates of any payment by TCOA of any principal and interest to the bondholders. All principal and interest payable by TCOA to the bondholders shall be immediately repayable by TCOA to TCOA without demand.

The prospectuses issued in connection with each bond issue contained similar provisions.

The offering statement in connection with the C & I bond issue stated in the "Summary of the Offering" that "all loans will be secured by a first mortgage or deed of trust lien on properties of the Borrower...."

It was common practice for the promoters to secure funds to pay off maturing bonds by having the church issue additional bonds. C & I represented a new concept where the investor, rather than purchasing a bond issued by a particular church, purchased a bond issued by a non-profit corporation which used the bond proceeds to finance churches meeting its investment criteria. Mr. Seals asserted that the net effect of these two arrangements, both from the churches', and the bondholders' standpoint is the same: principal and interest on some bonds is paid and a new obligation takes its place. He pointed out that each trust indenture and prospectus contained provisions allowing such refinancing. The RHCC prospectus of August 15, 1987, at page 10, anticipated refinancing on August 15, 1988 which was the date of the C & I loan to RHCC. Additional financing was contemplated in Footnote (1) on Page 12 of the Corvallis prospectus with respect to $210,000.00 worth of principal plus interest on bonds which would mature May 5, 1989. The Corvallis note and deed of trust to C & I are dated May 5, 1989 and are in the amount of $285,000.00.

## DISCUSSION

### Authority of the Trustee

Paragraph XXVI of the trust indenture provides that it is to be performed and construed according to the laws of the State of Texas. Thus, the trusts in question are governed by the Texas Trust Code which became effective January 1, 1984. That code is now contained in the Texas Property Code. Pertinent provisions read:

Section 113.001. Limitation of Powers. A power given to a trustee by this subchapter does not apply to a trust to the extent that the instrument creating the trust, a subsequent court order, or another provision of this subtitle conflicts with or limits the power.

Section 113.002. General Powers. Except as provided by Section 113.001, a trustee may exercise any powers in addition to the powers authorized by this subchapter that are necessary or appropriate to carry out the purposes of the trust.

The effect of the Texas Trust Code is to give trustees broad general powers, limited only by the trust instrument, a court order, or provisions of the Code.[4] Prior decisions limiting trustees to the powers conferred in the trust instrument are no longer applicable. *See, e.g., Grand Court of Order of Calanthe of Texas v. Ebeling,* 129 S.W.2d

---

**4.** It appears that the Legislature first adopted these provisions in the Texas Trust Act of 1943.

715, 718 (Tex.Civ.App.—Austin 1939, no writ).

Texas Property Code § 113.015 states that "[a] trustee may borrow money from any source, including a trustee, purchase property on credit, and mortgage, pledge, or in any other manner encumber all or any part of the assets of the trust as is advisable in the judgment of the trustee for the advantageous administration of the trust." Section 113.019 states that "[a] trustee may compromise, contest, arbitrate, or settle claims of or against the trust estate...." Under Texas law, lienholders may specify priority among themselves by contract and one who holds a superior lien may, by contract, subordinate it to the rights of an otherwise junior lienholder. *See, Vahlsing Christina Corp. v. First Nat'l Bank of Hobbs*, 491 S.W.2d 954 (Tex. Civ.App.—El Paso 1973, writ ref'd n.r.e.); *See also ITT Diversified Credit Corp. v. First City Capitol Corp.*, 737 S.W.2d 803 (Tex.1987). Subordination agreements are recognized and enforced by the courts of this state as contractual modifications of attached lien priorities. *Vahlsing* at 958. The Fifth Circuit Court of Appeals enforced the priority of liens as stated in a deed of trust and in a subordination agreement. *FDIC v. RepublicBank Lubbock, N.A.*, 883 F.2d 427 (5th Cir.1989).

■ FNB relies heavily on *Ebeling, supra*, for the proposition that a trustee may exercise only such power in dealing with the trust property as is expressly granted in the trust instrument. As noted above, that rule was abrogated by the Texas Trust Code. In addition, *Ebeling* stated that references in a deed of trust (the Texas form of mortgage) to the holder of the secured obligation as the trustee of a trust put a third party on notice of the provisions of the trust. 129 S.W.2d at 719. By negative implication §§ 101.001 and 114.082 of the Texas Property Code put third parties on notice when the trust is identified by stating:

> If property is conveyed or transferred to a person designated as a trustee but the conveyance or transfer *does not identify a trust* or disclose the name of any beneficiary, the person designated as trustee may convey, transfer, or encumber the title of the property without subsequent question by a person who claims to be a beneficiary under a trust or who claims by, through, or under any undisclosed beneficiary or by, through, or under the person designated as trustee in that person's individual capacity (emphasis added).

The deeds of trust executed by RHCC and Corvallis clearly recite that TCOA was acting as trustee for the benefit of bondholders under a specified bond issue. Thus, third parties (including purchasers and attaching creditors) were put on notice of limitations on the trustee's powers contained in the trust documents.[5] Since Mr. Seals had constructive notice of the trust documents, he cannot claim the status of a bona fide purchaser under § 544(a)(3) of the Bankruptcy Code.

### Are TCOA's Powers Limited by the Trust Documents?

We now turn to the question of whether the trust documents prohibited TCOA from entering into an agreement granting C & I a first lien of equal priority on the properties involved. Here we do not deal with the powers given to TCOA as a corporation by the Texas Business Corporation Act but, rather, with the powers which the Texas

---

5. Prior to the enactment of §§ 101.001 and 114.-082 in 1984, Tex.Rev.Civ.Stat.Ann. art. 7425a. and 7425b–8. of the Texas statutes read:

> Where a trust is created, but *is not contained or declared in the conveyance* to the trustee, or when a conveyance or transfer is made to a trustee without disclosing the names of the beneficiary, or beneficiaries, the trustee shall be held to have the power to convey or transfer or encumber the title and whenever he shall execute and deliver a conveyance or transfer or encumbrance of such

> property, as trustee, such conveyance or transfer or encumbrance shall not thereafter be questioned by any one claiming as a beneficiary under such trust or by any one claiming by, through, or under an undisclosed beneficiary ... (emphasis added)

Cases such as *Kagan v. Moody*, 309 S.W.2d 515 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.), *cert. denied*, 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958), which required that the document contain or declare the trust and name the beneficiaries, are no longer applicable.

Trust Code gives to a trustee—regardless of whether that trustee is an individual or a corporation. The fact that the promoters often used such agreements does not make them permissible.

FNB urged that the documents require that the bondholders have an *exclusive* first lien on each property. Although the term "exclusive" is not used in any of the documents, FNB reaches this conclusion by pointing to several provisions in the documents:

A. Paragraph XI of the trust indenture makes no mention of third party financing. It allows "a new series of additional bonds *hereunder* which shall be secured pro rata and have equal priority in payment" (emphasis added) for various purposes including paying off any existing indebtedness and exchanging or replacing bonds issued under the terms of the trust indenture. FNB asserted that since third party financing was not specifically authorized, it was prohibited.

The Texas Trust Code grants trustees all powers not limited by the trust instruments or by the Code. The court finds that the failure to specifically mention third party financing does not exclude third party financing.

B. One of TCOA's duties under paragraph XVI(1.)(b) was to hold "a first or general mortgage lien of record to Issuer's property given as security for the bond program" for the benefit of the bondholders. One of the events of default in paragraph VIII(A)(3) is the failure or refusal of the issuer to pay "any claims, liens, or encumbrances prior to or in parity with the Lien of this issue ..." FNB pointed to other provisions using the phrases "pay when due" and "timely paid" to conclude that liens of equal parity are prohibited.

FNB's construction ignores the specific mention of equal priority of payment in paragraph XI on additional bond issues and in paragraph XXV on TCOA's guaranty.

C. FNB asserted that the prospectuses for the RHCC and Corvallis bond issues evidence an exclusive intent by referring to "first mortgage bonds" and the fact that the bonds will be secured by a first mortgage on the issuer's property.

The court does not find this argument persuasive since similar intent is expressed in the C & I prospectus. Although several provisions of each prospectus refer to paying off prior liens, they also provide that the bonds issued under the offering would have equal priority with bonds of prior offerings.

D. Paragraph XI provides that additional bonds are not to be issued if the issuer is in default and places other restrictions on the issuance of additional bonds. FNB pointed out that Corvallis was delinquent from time to time and was apparently at least a few days delinquent in making payment to its bondholders while the C & I financing was being concluded. FNB also questioned whether the interest rate paid to C & I was appropriate and whether the other requirements of paragraph XI for the issuance of additional bonds were met.

The C & I bondholders, and Mr. Seals as trustee for their benefit, have a right to assume that TCOA followed the proper procedures and any questions by FNB on those matters should be directed toward TCOA's fiduciary responsibility and not to the validity of C & I's liens.

E. FNB asserted that TCOA engaged in self dealing by securing the financing from C & I. If RHCC and Corvallis defaulted, TCOA and its related insurance company would have been liable under their guaranty and insurance described in the prospectuses.

Assuming such activity constituted self dealing, FNB must look to TCOA for redress and not to the C & I bondholders.

F. FNB asserted that if RHCC had defaulted and if the Corvallis default had not been cured by the additional financing, TCOA would have been obligated to give the bondholders an opportunity to instruct TCOA to foreclose on the collateral.

Whether the requisite percentage of bondholders would have instructed TCOA to foreclose is a matter of conjecture. Whether TCOA breached a fiduciary duty by not giving the bondholders the option to foreclose is a question of whether TCOA properly carried out its fiduciary duties and not question of validity or priority of C & I's liens.

### CONCLUSIONS

The cornerstone of FNB's argument is that a trustee is limited to the powers granted by the trust instrument. The Texas Trust Code gives the trustee all powers not prohibited by the trust instrument or the Code. Under the Trust Code the specific enumeration of powers does not exclude other powers. Thus the mention in the trust indenture of two methods of refinancing (additional bonds or payment by TCOA under its guaranty) would not exclude secured financing from other sources. The trust indenture requires that the liens for the benefit of the bondholders be first liens on the property. However, it does not prohibit equal first liens and, in fact, refers to equal first liens in at least two instances. The court finds that the deeds of trust held by C & I are valid and enforceable and that the Modification Agreements under which C & I's liens became co-equal first liens with those of the RHCC and Corvallis bondholders are valid and enforceable.

Additionally, this is a court of equity and when faced with a choice, the court should select the choice which does equity and justice to the parties. This court's decision gives the RHCC, Corvallis and C & I bondholders a first lien on the property, which is what they bargained for. A decision for FNB would give the Corvallis and RHCC bondholders an unexpected windfall by the subordination of C & I's liens. The Corvallis and RHCC bondholders knew of the possibility of refinancing with equal first liens because of the language contained in the Trust Indentures and the prospectuses. C & I's lien was not a surprise,

nor did it put the bondholders in an unexpected position. The fact that the refinancing was by C & I rather than from the issuance of additional bonds or payments on TCOA's guaranty did not work to the bondholders detriment.

TCOA is the trustee of all bond issues involved and thus owed a fiduciary duty to all bondholders. Whether TCOA violated that fiduciary duty is not at issue in this proceeding and the court offers no opinion on that matter.

JUDGMENT ACCORDINGLY.[6]

---

**6.** This Memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.